**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

_____

PATRICK HAUN,

                Plaintiff,

     vs.

DOUGLAS CHASE, WADE NASH,
ANTHONY DENTLER, DANIEL
DURYEE, and JEFF FORD,

                Defendants.

CV 11-82-M-DWM-JCL

FINDINGS AND
RECOMMENDATIONS

_____

Plaintiff Patrick Haun ("Haun") commenced this action after an encounter

with law enforcement officers who mistakenly entered his apartment while

investigating a domestic assault. Haun brings suit against the City of Polson's

former police chief, Douglas Chase ("Chase") and several city and county law

enforcement officers in their individual and official capacities, asserting federal

constitutional claims under 42 U.S.C. § 1983 and state law claims for negligent

investigation, assault and battery, false arrest and imprisonment, trespass, and

invasion of privacy.

Chase and City of Polson police officers Wade Nash ("Nash") and Anthony Dentler ("Dentler") have filed motions for summary judgment on all of Haun's individual and official capacity claims. For the reasons set forth below, Chase, Nash, and Dentler (collectively "Defendants") are entitled to summary judgment and their motions should be granted.

## I.   <u>Background</u>

For summary judgment purposes, the Court is to take the material facts from the record and, where disputed, view them in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 474 U.S. 574, 587-88 (1986). This task is complicated somewhat by the fact that Haun has not submitted a statement of genuine issues in response to either of the Defendants' two motions for summary judgment as required by Local Rule 56.1(b). Nor has he filed any exhibits or affidavits in opposition to Defendants' motions. By necessity, then, the following facts are taken from the evidentiary materials submitted by Defendants in support of their summary judgment motions.[1] Consistent with well-established summary judgment standards, the

---

[1] Most of these facts are culled from the police report prepared by the law enforcement officers involved in the incident giving rise to Haun's lawsuit. Dkt. 42-1. Defendants have properly authenticated the police report with an affidavit from Defendant Wade Nash, now the Chief of Police for the Polson Police Department. Dkt. 45. *See United States v. Pasznit*, 703 F.2d 420, 424 (9th Cir.

Court views these facts in the light most favorable to Haun as the non-moving party.

In the early morning hours of June 2, 2009, Joseph Mitchell ("Mitchell") and Tiffany Higgins ("Higgins") became involved in a domestic dispute at their apartment in Polson, Montana. Dkt. 42-1, at 2. Higgins left her apartment after the altercation with Mitchell and sought help at the Lake County Sheriff's office located across the street. Defendants Daniel Duryee ("Duryee") and Jeff Ford ("Ford"), both Lake County Sheriff's Deputies, first encountered Higgins as she was walking across the street to the Sheriff's office. Dkt. 42-1, at 4. Duryee reported that "Higgins was visibly upset and had blood coming from her nose." Dkt. 42-1, at 4.

Higgins told Ford and Duryee that Mitchell had just assaulted her in her apartment in the building across the street. Dkt. 42-1, at 4. When Duryee asked Higgins which apartment was hers, "she pointed to the right or North side of the building said the one on the far end." Dkt. 42-1, at 4. According to Ford, Higgins "indicated that the assault took place in their apartment (#4) which is located on 1st St. E., directly west of the courthouse." Dkt. 42-1, at 8.

---

1983); *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (material presented in summary judgment proceedings must set out facts that the moving party "will be able to prove through admissible evidence" at trial).

As other officers accompanied Higgins into the Sheriff's office, Duryee and Ford were joined on the scene by Dentler, a Polson police officer. Dkt. 42-1, at 8. The officers walked toward the "small, single story apartment building," across the street which is long and narrow and "runs straight west." Dkt. 42-1, at 8. They continued along the building's "north side, passing by Apartments 1, 2, and 3." Dkt. 42-1, at 8. When officers reached Apartment 4 on the westernmost end of the building, they noticed a pile of men's clothing on the ground on and near the steps to the small front porch. Dkt. 42-1, at 4,6, & 8. They also found that there were two open windows to the west of the door, both of which were open, and two windows to the east of the door. Dkt. Dkt. 42-1, at 3, 6 & 9.

The officers "knocked loudly on the door and yelled 'Police, come to the door' several times," but received no response from within. Dkt. 42-1, at 4. Duryee approached the "two open windows to the west" of the apartment door and "yelled 'Police' through the open windows several times, again with no response." Dkt. 42-1, at 4. At some point, city police officer Nash arrived on the scene as well. Dkt. 42-1, at 6. Nash "opened the shade" on one of the windows to the west of the apartment's front door and "cleared the room from outside the window." Dkt. 42-1, at 3. Both Nash and Dentler had been informed by dispatch prior to their arrival that Mitchell was "flagged" as "an officer caution." Dkt. 42-

1, at 3 & 6.

Ford "went around to the building's other side to see if there was another exit" for Apartment 4, and saw that "there was a door there with a similar porch but it was labeled #5." Dkt. 42-1, at 8. Ford noticed three other front porches on the south side of the building, which "indicated to [him] that the apartments' interiors must be divided by a wall running down the middle of the building along its length." Dkt. 42-1, at 8.

In the meantime, Duryee walked back to the Sheriff's office and "asked Higgins for permission to enter the residence." Dkt. 42-1, at 4. Higgins gave Duryee "permission to enter and locate Mitchell." Dkt. 42-1, at 4. When Duryee returned to the apartment building, however, the officers discovered that the door to Apartment 4 was locked. Dkt. 42-1, at 4. Dentler then called dispatch, and Higgins indicated "that her key was in her purse inside the apartment but that the windows were open." Dkt. 42-1, at 5.

At that point, Nash "decided to make entry into the residence based" on Higgins' consent. Dkt. 42-1, at 3. "Duryee agreed to go through the window that [Nash] had cleared earlier," and the officers again announced their "presence by yelling police and sheriffs office several times with negative response." Dkt. 42-1, at 3. Nash and Dentler boosted Duryee through the larger of the two open

windows to the right of the door to Apartment 4.  Dkt. 42-1, at 3.

As it turned out, however, that window led to a bedroom in a neighboring apartment.  Duryee "walked out of the bedroom and into the front room of the apartment" where he found a man, later identified as Haun, lying on the couch. Dkt. 42-1, at 5.  Duryee repeatedly identified himself and ordered the man to put his hands behind his back.  Dkt. 42-1, at 5.  Haun refused to comply, and Duryee advised him "that he was under arrest" and again instructed him to put his hands behind his back.  Dkt. 42-1, at 4.  Haun still refused to comply, all the while "yelling profanities" at Duryee.  Dkt. 42-1, at 5.  Duryee grabbed Haun's wrist, and Haun "began resisting by pulling away from [Duryee] and trying to spin towards [him]."  Dkt. 42-1, at 5.  According to Haun, Duryee tackled him during the arrest procedure.  Dkt. 42-3.  Duryee was able to handcuff Haun, and then explained that he "was there investigating an assault."  Dkt. 42-1, at 5.  At that point, Haun told Duryee he "was at the wrong apartment and indicated with his head and hands towards the wall that" separated Haun's apartment from the one occupied by Mitchell.  Dkt. 42-1, at 5.

In the meantime, Ford had positioned himself at an open window several feet to the east of the one entered by Duryee.  Dkt. 42-1, at 9.  As Ford, Nash, and Dentler soon came to learn, it was *this* window that actually led to Higgins'

6

apartment. While Duryee was in Haun's apartment, Mitchell approached the window where Ford had positioned himself. Dkt. 42-1, at 7. Nash and Dentler joined Ford at the window, and engaged Mitchell.

Within moments of their doing so, Duryee "reported on the radio that he was with a Patrick Haun," and had him in handcuffs. Dkt. 42-1, at 3 & 7. Nash then "went to assist with that situation." Dkt. 42-1, at 7. Duryee let Nash "into the apartment and confirmed that [they] were in Apartment 5 rather [Apartment] 4 where the assault occurred." Dkt. 42-1, 5. As Nash entered the apartment, Haun "was yelling profanities" and said he and Duryee were lucky he did not have a gun because he would have "put a bullet in your head." Dkt. 42-1, at 5.

Duryee "checked Haun for warrants," and although he "came back with an active warrant out of flathead County," the "warrant was not extradictable." Dkt. 42-1, at 5. Duryee explained the situation to Haun, "and he was unarrested." Dkt. 42-1, at 5. Duryee and Nash then rejoined Ford and Dentler outside of Mitchell's window. Nash convinced Mitchell to come outside and arrested him for assaulting Higgins. Dkt. 42-1

Shortly thereafter, Dentler "was dispatched to Haun's house as he wanted an ambulance and wanted to speak to an officer." Dkt. 42-1, at 7. Dentler and Nash went to Haun's apartment and found that "he was very upset." Dkt. 42-1, at 7.

Haun complained "that his arms were hurt" and "he gestured to his elbows each time." Dkt. 42-1, at 7. When Haun "said that he wanted to press charges," Dentler told him "that he would have to file a complaint with either the Sheriff's Office or the Polson Police Department." Dkt. 42-1, at 7.

Haun filed this lawsuit nearly two years later. He advances claims under 42 U.S.C. § 1983 against all named Defendants in their individual and official capacities for allegedly violating his Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure and the use of excessive force. Dkt. 1. Haun has also asserted several state law claims against all of the Defendants in their individual and official capacities. Chase, Dentler, and Nash have filed two motions for summary judgment – one addressing Haun's official capacity claims and one addressing his individual capacity claims.

## II.  <u>Summary Judgment Standards</u>

Fed. R. Civ. P. 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party moving for summary judgment who does not have the burden of persuasion at trial, must produce evidence which either: (1) negates an essential element of the non-moving party's claim, or (2) shows that the non-moving party does not have enough evidence of an essential

element to ultimately carry his burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1000, 1102 (9th Cir. 2000). Once the moving party has satisfied its burden, the non-moving party must identify evidence establishing that a dispute as to a particular material fact is genuine. *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* And the opponent "may not rest upon the mere allegations or denials of his pleading, but must set forth facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "genuine" if there is sufficient evidence for a reasonable factfinder to find for the non-moving party. *Anderson*, 477 U.S. at 248-49. A fact is "material" if may affect the outcome of the case. *Id.* at 248.

"In considering a motion for summary judgment the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *abrogated on other grounds as noted in Shakur v. Schririo*, 514 F.3d 878, 884-85 (9th Cir. 2008).

III. **Discussion**

## A.     Official Capacity Federal Claims

Chase, Nash, and Dentler argue they are entitled to summary judgment on Haun's official capacity claims under Section 1983 because the claims are the functional equivalent of a lawsuit against the City of Polson, and Haun has not shown that a municipal custom, policy, or practice played a part in the constitutional violations he alleges or otherwise presented any evidence that would establish the necessary prerequisites for municipal liability.  Dkt. 39.

The Court notes at the outset that Haun has not filed any brief in opposition to Defendants' motion for summary judgment on his official capacity claims, and the time for doing so has long since passed.  Under Local Rule 7.1(d)(1)(B), a "failure to file a response brief may be deemed an admission that the motion is well-taken."  But the Ninth Circuit has made clear that a district court may not grant "summary judgment simply because a party fails to file an opposition or violations a local rule" and must "analyze the record to determine whether any disputed material fact [is] present."  *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1258 (9th Cir. 2010).  *See also Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003) (explaining that "a nonmoving party's failure to comply with local rules does not excuse the moving party's affirmative duty under Rule 56 to

demonstrate its entitlement to judgment as a matter of law.").

Bearing these principles in mind, the Court turns now to the question of whether Defendants have met their summary judgment burden of showing that there are no material issues of fact and that they are entitled to judgment as a matter of law on Haun's official capacity federal claims.

To prevail on a claim under 42 U.S.C. § 1983, "a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir. 1990). When a plaintiff brings such a claim against an individual defendant in his official capacity, the claim "'generally represent[s] only another way of pleading an action against an entity of which an officer is an agent.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) and *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690 n.55 (1978)). Consequently, an official-capacity suit is treated as a suit against the employing governmental entity, and the entity is considered the real party in interest. *Hafer*, 502 U.S. at 25.

"A governmental entity may not be held liable under 42 U.S.C. § 1983 unless a policy, practice, or custom of the entity can be shown to be a moving

force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). In some cases, a governmental entity may also be held liable for "acts of omission," like failing to develop and implement policies and procedures or failing to adequately train its employees. *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010).

To impose liability on this basis, "the government's omission must amount to 'deliberate indifference' to a constitutional right." *Clouthier*, 591 F.3d at 1249. This standard is met when "the need for more or different training" or the need for policies and procedures "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Clouthier*, 591 F.3d at 1249 (*quoting City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

A local government may also "be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'"[2] *Clouthier*, 591 F.3d at 1250 (*quoting*

---

[2] It is undisputed that Chase was not at the scene on the night in question, and Haun does not argue or point to any evidence that he somehow ratified Nash and Dentler's conduct during their encounter with Haun.

*Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9ᵗʰ Cir. 1992).

Although Haun has not responded to Defendants' motion, the grounds on which he apparently hoped to establish municipal liability are set forth in his discovery responses.[3]  Dkt. 42-7, 42-8.  As those discovery responses reflect, Haun alleged the City of Polson maintained customs, policies, or practices permitting its officers to unconstitutionally: (1) enter a residence without a warrant even when there were no exigent circumstances; (2) detain a person in handcuffs even after learning the person was not a suspect, had committed no crime, and presented no danger, and; (3) use excessive force when taking a person into custody.  Dkt. 42, at ¶ 38.

But the materials presented by Defendants on summary judgment show otherwise.  Defendants have submitted an authenticated copy of the City of Polson's written policies on obtaining search warrants and the use of force.  Dkt. 42-9.  The policy relating to search warrants is constitutional on its face because it instructs officers to obtain a warrant before conducting a search unless there are exigent circumstances, and requires that any search conducted without a warrant be reasonable.  Dkt. 42-9, at 1.  *See e.g. Kentucky v. King*, __ U.S. __, 131 S.Ct.

---

[3]  Defendants have submitted copies Haun's discovery responses as exhibits in support of their motion for summary judgment.

13

1849, 1856 (2011) (again recognizing the well-established exigent circumstances exception to the warrant requirement in the Fourth Amendment context); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (a warrantless search can be constitutional if it is objectively reasonable under the totality of the circumstances).

The City of Polson's policy on the use of force also comports with the Fourth Amendment because it provides that an officer may use "only the amount of force that is reasonable and necessary to make an arrest or gain control of a situation." Dkt. 42-10, at 1. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Because Defendants have shown that the policies identified by Haun are constitutional, and Haun has not presented any evidence or argument to contrary, Haun's claim for municipal liability based on an unconstitutional custom or policy fails as a matter of law.

Haun's discovery responses also indicate that he initially sought to establish municipal liability for "acts of omission." *Clouthier*, 591 F.3d at 1249. In particular, he alleged that Chase, as the Chief of Police, was a final policymaker for the City of Polson,[4] and failed to have a policy in place that would have

---

[4] The parties have stipulated that Nash and Dentler were not final policymakers for the City of Polson. Dkt. 32, at 4.

prevented the unconstitutional: (1) "entry into a residence to arrest an individual when no exigent circumstances exist"; (2) continued detention by handcuffing after officers learn they have taken the wrong person into custody, and; (3) use of physical force. Dkt. 42, ¶ 37. Haun also alleged that Chase failed to adequately train Nash and Dentler. Dkt. 42, at ¶¶ 39, 42. But Haun has not identified any evidence suggesting there was any need to promulgate those policies or to implement more or different training. Nor has he presented any evidence indicating those needs were so obvious that the failure to act amounted to deliberate indifference. *Clouthier*, 591 F.3d at 1249. To the extent Haun seeks to imposed municipal liability under § 1983 based on acts of omission, his claim fails as a matter of law. Defendants' motion for summary judgment on Haun's official capacity claims under Section 1983 should be granted accordingly.

## B.      Individual Capacity Federal Claims

Haun alleges that Chase, Nash, and Dentler are liable under 42 U.S.C. § 1983 for violating his Fourth Amendment rights by unlawfully: (1) entering and searching his apartment; (2) seizing and detaining him, and; (3) using excessive force in effecting his arrest. Defendants have moved for summary judgment on the ground that they are entitled to qualified immunity from liability on these Fourth Amendment claims.

As state actors, law enforcement officers like Chase, Nash, and Dentler are entitled to qualified immunity if their conduct "either does not violate a federal constitutional right, or the constitutional right was not clearly established on the date of the alleged violation." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Qualified immunity provides an immunity from suit rather than a mere defense to liability." *Mattos v. Agarano*, 590 F.3d 1082, 1086 (9th Cir. 2010).

Courts addressing a law enforcement officer's claim of qualified immunity are to follow the two-part analysis established by the United States Supreme Court in *Saucier*. The "threshold question" under the *Saucier* analysis is whether "[t]aken in the light most favorable to the party asserting the injury," the facts as "alleged show the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. If there was no constitutional violation, no further inquiry is necessary. *Saucier*, 533 U.S. at 201. If the facts as alleged do show that the officer's conduct violated a constitutional right, however, the court must next consider "whether the right was clearly established in light of the specific context of the case." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009).

While *Saucier* instructed that these two inquiries be made in the sequential order set forth above, the United States Supreme Court has since made clear that

courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). Because it is appropriate to do so here, the Court begins with the first of these two inquiries.

1.    Chase

Chase maintains he is entitled to qualified immunity based on the well-established principle that supervisory officials may not be held liable under Section 1983 for the unconstitutional conduct of their subordinates based on a theory of respondeat superior. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Because it is undisputed that Chase was not present at the scene on the night in question, he argues he cannot be held vicariously liable under Section 1983 for the alleged conduct of his subordinates. As Haun concedes in his response brief, Chase is correct. Haun's Section 1983 claims against Chase are properly dismissed.

2.    Nash and Dentler

Nash and Dentler argue they are entitled to qualified immunity for their role in investigating the correct entry point and otherwise helping Duryee enter Haun's apartment because, based on the information available to them at the time, their

17

actions were objectively reasonable.

Fourth Amendment claims like Haun's must be evaluated "under an objective reasonableness standard." *Espinoza v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). The Fourth Amendment is not violated where officers, through an objectively reasonable mistake, search the wrong property. *Graham v. Connor*, 490 U.S. 386, 396 (1989)(citing *Maryland v.Garrison*, 480 U.S. 79 (2987)). The reasonableness of a particular action "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This means that the reasonableness of the officers' actions should be assessed based on the information available to them at the time, and as their investigation and search proceeded. *Maryland v. Garrison*, 480 U.S. 79, 87 (1987).

The law thus affords officers "some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests" and conducting searches. *Maryland*, 480 U.S. at 87. Ultimately, the propriety of law enforcement officers' conduct in searching the wrong premises depends on whether the officers' conduct "was objectively understandable and reasonable[]" such that their conduct was an honest mistake to which qualified immunity applies. *Maryland*, 480 U.S. at 88.

The undisputed evidence in this case shows that Nash and Dentler had an objectively reasonable basis for believing that the window they selected led to the apartment occupied by Mitchell. Higgins had advised officers at the scene that her apartment was on the north side of the building at the far west end. And when Higgins gave officers her consent to enter the apartment,[5] she advised them that the windows were open. Nash and Dentler planned their entry accordingly, selecting an open window to the west of the door to Apartment 4, on the north side and westernmost end of the building. Likewise, the location of the doors on the north and south sides of the building reasonably led officers to believe that the apartments were divided by a wall running down the middle of the building along its length, which suggested that the windows to the west of Higgins' front door led to her apartment. The officers repeatedly knocked and announced their presence to no effect, before making the objectively reasonable decision to enter by way of the open window to the west of Higgins' front door.

In response to Defendants' motion, Haun conclusorily asserts that "[t]here is sufficient evidence to raise a genuine issue of fact regarding" the reasonableness of the officers' entry into his apartment. Dkt. 51, at 5. But Haun does not explain

---

[5] Consent given freely and voluntarily is a recognized exception to the Fourth Amendment warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

what those facts might be, and does not point to any evidence that would call the reasonableness of the officers' decision into question.

There is simply no indication that the officers knew or reasonably should have known they were entering the wrong apartment. To the contrary, "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Maryland*, 480 U.S. at 88. Nash and Dentler simply made an honest mistake. Because the undisputed evidence of record establishes that Nash and Dentler's conduct was objectively reasonable, they are entitled to qualified immunity for their role in mistakenly entering the wrong apartment.

Nash and Dentler also argue they are entitled to qualified immunity from Haun's Fourth Amendment claims for unlawful arrest and the use of excessive force because they were not physically present when Duryee actually arrested Haun and did not instruct him to use force in effecting the arrest. Haun concedes that Defendants' position is well taken, and agrees that Nash and Dentler are entitled to qualified immunity from his claims for unlawful arrest and excessive use of force with one caveat. Haun takes the position that Nash violated the Fourth Amendment's prohibition against the excessive use of force because he "should have instructed Duryee, or should have himself, unhandcuffed [Haun]

*immediately* upon determining that they had detained the wrong person." Dkt. 51, at 6 (emphasis in original).

Because it was Duryee who arrested Haun and placed him in handcuffs, the real issue here is whether Nash can be held responsible for not intervening and removing Haun's handcuffs when he arrived on the scene, thereby preventing Duryee from allegedly violating Haun's Fourth Amendment rights. The Ninth Circuit has made clear that police officers may be liable under 42 U.S.C. § 1983 for failing to intercede "when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). Consistent with this principle, an officer who fails to intercede when his colleagues are "depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest [may], like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights." *United States v. Koon*, 34 F.3d 1416, 1477 n. 25 (9th Cir. 1994).

Significantly, however, an officer "can be held liable for failing to intercede only if [he] had a[] ["realistic"] opportunity to intercede." *Cunningham*, 229 F.3d at 1289. "Furthermore, bystander officers only have a duty to stop a violation when they know or have reason to know of the constitutional violation." *Monteilh v. County of Los Angeles*, 820 F. Supp. 2d 1081, 1092 (C.D. Cal. 2011) (citing

*Ramirez v. Butte–Silver Bow County*, 298 F.3d 1022, 1029–30 (9th Cir. 2002)).

Here, there is nothing to suggest that Nash should have somehow known that Duryee was even arguably violating Haun's Fourth Amendment rights by keeping him in handcuffs while Duryee checked for outstanding warrants. To the contrary, the undisputed evidence establishes that Nash had no duty to intervene under the circumstances. Nash knew, for example, that Haun had been unresponsive when the officers first announced their presence at the window, and Nash overheard Duryee "yelling commands from inside the residence" during the actual arrest. Dkt. 42-1, at 3. It would have been objectively reasonable for Nash to believe based on what he knew at the time that Haun had been resisting Duryee's efforts to arrest him.[6]

And when Nash entered the apartment after the arrest, Haun "was yelling profanities" and told the officers they were lucky he did not have a gun because he would "put a bullet in your head." Dkt. 42-1, at 5. For the few minutes that Haun remained in handcuffs, Nash and Duryee were trying to sort everything out and confirm exactly who Haun was, and which apartment they were in. Dkt. 42-1 at 5. As soon as Duryee finished checking for outstanding warrants, he explained the

---

[6] Under Montana law, a person is not permitted to resist an arrest being made by a police officer, "even if the person believes that the arrest is unlawful and the arrest is in fact unlawful." Mont. Code Ann. § 45-3-108.

situation to Haun and unarrested him.  Dkt. 42-1, at 3 & 5.  Because it was

objectively reasonable for Nash to believe that Duryee was not violating Haun's

Fourth Amendment rights, he had no duty to intervene and is entitled to qualified

immunity.[7]   Defendants' motion for summary judgment on Haun's individual

capacity federal claims should be granted accordingly.

### C.      Individual Capacity State Law Claims

Defendants move to summarily dismiss Haun's individual capacity state law

claims based on the statutory immunity granted under Mont. Code Ann. § 2-9-

305(5).  That statute provides:

> In an action against a governmental entity, the employee whose conduct
> gave rise to the suit is immune from liability by reasons of the same subject
> matter if the governmental entity acknowledges...that the conduct upon
> which the claim is brought arises out of the course and scope of the
> employee's employment, unless [certain exclusions apply.]

> Mont. Code Ann. § 2-9-305(5).

Consistent with section 2-9-305(5), the Montana Supreme Court has held

that "where an action is brought against a county based on actionable conduct by

an employee, the employee is immune from individual liability for the conduct if

---

[7] To the extent Haun argues that Nash directly violated his Fourth
Amendment rights by not removing his handcuffs immediately after entering the
apartment, the same undisputed facts show otherwise.  Nash's actions were
objectively reasonable under the circumstances.

the county acknowledges that the conduct arose out of the course and scope of the employee's official duties." *Kenyon v. Stillwater County*, 835 P.2d 742, 745 (Mont. 1992), overruled on other grounds by *Heiat v. Eastern Montana College*, 912 P.2d 787, 793 (Mont. 1996). *See also Germann v. Stephens*, 137 P.3d 545, 553 (Mont. 2006).

The parties have expressly stipulated that Chase, Nash and Dentler were acting in "the course and scope of their employment as law enforcement officers." Dkt. 32, at 4. Haun therefore concedes that Chase, Nash, and Dentler are entitled to statutory immunity with respect to his individual capacity state law claims. Dkt. 51, at 6. Defendants' motion for summary judgment on Haun's individual capacity state law claims is properly granted.

### D. Official Capacity State Law Claims

Haun has also asserted all of his state law claims against Chase, Nash, and Dentler in their official capacities. Although it is not named as a Defendant, the City of Polson is the real party in interest with regard to these claims. Montana law provides that "[e]very governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties[.]" Mont. Code Ann. § 2-9-102. Thus, the City of Polson is subject to potential liability for Chase, Nash, and Dentler's acts or omissions.

1.  <u>Acting in Concert</u>

Defendants move for summary judgment on Haun's state law claims to the extent he seeks to hold them indirectly liable for Duryee's conduct based on an "acting in concert" theory.

Under Montana law, an individual defendant can be held liable for the tortious conduct of another individual if the former "knows that the other's conduct constitutes a breach of duty and [the former] gives substantial assistance or encouragement to the other so to conduct himself." *Sloan v. Fauque*, 784 P.2d 895, 896 (Mont. 1989) (quoting Restatement (Second) of Torts § 876).  Thus, "where two or more persons commit tortious acts in concert, all are liable for the tortious acts of anyone." *Sloan*, 784 P.2d at 896.

Haun expressly concedes that Defendants' argument is, for the most part, well taken.  Dkt. 51, at 6.  To the extent he disagrees, Haun's entire argument reads as follows: "Nash determined the course of action of entering the apartment. He and Dentler boosted Duryee into the apartment; therefore, as to privacy they have direct and indirect liability."  Dkt. 51, at 6.

But Haun has not identified any facts or cited to any evidence in the record suggesting that Nash and Dentler knew when they decided to enter Haun's apartment that doing so might violate Haun's right to privacy.  To the contrary,

and as discussed above, the undisputed evidence establishes that Nash and Dentler had an objectively reasonable basis for believing the window they selected led to the apartment occupied by Mitchell. Because Haun has not pointed to any evidence that Nash and Dentler knew, or reasonably should have known, that Duryee's entry through the window might be tortious, Nash and Dentler cannot be held liable for Dentler's actions under an "acting in concert theory."

      2.   <u>Negligence</u>

Haun alleges Nash and Dentler were negligent in their investigation of "the correct entry point" to Higgins' apartment, and proximately caused the injury and damage he complains of. Dkt. 1, at 7. Defendants move for summary judgment, arguing they had no duty to Haun under the public duty doctrine. In an argument that encompasses breach, causation, and damages, Defendants also take the position that "no act or omission" on their part "relating to an entry into the apartment caused any damage or injury to [Haun as a result of his handcuffing or the use of force." Dkt. 41, at 14. Haun's only argument to the contrary is that "[t]here is a legal duty owed," and "[a]n officer may be held liable for negligence in carrying out his duty." Dkt. 51, at 7.

Even assuming that Defendants are wrong on their public duty doctrine argument and they did in fact have a duty to investigate the correct entry point to

Higgins' apartment, the undisputed evidence of record establishes that they properly discharged that duty here. Their duty, if any, was "to use the degree of care that an ordinarily prudent person would have used under the same circumstances." *Barr v. Great Falls International Airport Authority*, 107 P.3d 471 477 (Mont. 2005).

As discussed above, Higgins indicated to officers on the scene that hers was the westernmost apartment on the north side of the building, that the windows were open, and gave them consent to enter. The officers on the scene reasonably believed based on location of the building's doors that the windows to the west of Higgins' front door led to her apartment. The officers repeatedly knocked and announced their presence to no effect, and only then decided to enter by way of the open window. The extent of Defendants' investigation was reasonable, particularly under the circumstances that evening. Defendants were seeking a suspect in a domestic assault that had allegedly taken place earlier that evening and had left the victim "visibly upset" with "blood coming from her nose." Dkt. 42-1, at 4. Moreover, Nash and Dentler had both been informed prior to their arrival on the scene that the suspect they were seeking was flagged as "an officer caution." Dkt. 42-1, at 3 & 6.

This evidence was all set forth in the materials submitted by Defendants' in

support of their two motions for summary judgment. Despite having had ample opportunity to do so, Haun has not pointed to any evidence calling the reasonableness of Defendants' actions that night into question. Because the undisputed evidence establishes that Defendants used "the degree of care that an ordinarily prudent person would have used under the same circumstances" in investigating the correct entry point to Higgins' apartment, they satisfied any duty they may have had under Montana negligence law. *Barr*, 107 P.3d at 477. Haun's negligence claim fails accordingly.

### 3. Assault and Battery

Haun concedes that Chase, Nash and Dentler are entitled to summary judgment on his assault and battery claims.

### 4. False Arrest and Imprisonment

For the most part, Haun concedes that Defendants are entitled to summary judgment on his claims for false arrest and imprisonment. Haun does, however, stand by his position that Nash remains liable for failing to immediately remove Haun's handcuffs when Duryee let him into the apartment.

To prevail on a claim for false arrest or false imprisonment, Haun must present evidence that his restraint in handcuffs was unlawful. *Kichnet v. Butte-Silver Bow County*, 274 P.3d 740, 745 (Mont. 2012). As discussed above,

however, Haun has not pointed to any evidence that Nash should have somehow known that allowing him to remain in handcuffs while Duryee checked for outstanding warrants was unlawful. Because Haun has not presented any evidence raising a genuine issue of material fact as to whether his restraint was unlawful, his false arrest and imprisonment claims should be dismissed.

      5.    <u>Trespass</u>

Haun concedes that Chase is entitled to summary judgment on his trespass claim, but stands by his position that because Nash and Dentler were integral participants in Duryee's entry into his apartment, they should be held liable for trespass.

A trespass is "an intrusion on a party's right to exclusive possession of his property." *Burley v. Burlington Northern & Sant Fe Railway Co.*, 273 P.3d 825, 828 (Mont. 2012) (citation omitted). But a trespass is limited to only those intrusions that are unauthorized or unlawful. *Koeppen v. Bolich*, 79 P.3d 1100, 1110 (Mont. 2003). Moreover, the Montana Supreme Court has specifically held that the actions of law enforcement officers are not unauthorized for purposes of establishing a claim of trespass "when the officers are proceeding on the basis of a reasonable, good faith understanding of the law and do not act with unreasonable violence or subject citizens to unusual indignity." *Dorwart v. Caraway*, 966 P.2d

1121, 1151 (Mont. 1998) (citations omitted), overruled on other grounds, *Trustees of Indiana University v. Buxbaum*, 69 P.3d 663 (Mont. 2003).

As discussed at length above, the undisputed evidence in this establishes that Nash and Dentler were proceeding on a reasonable, good faith belief as to what they were legally authorized to do. Higgins had given the officers permission to enter her apartment, and the officers reasonably believed they were entering her apartment. Nor has Haun presented any evidence that Defendants acted with "unreasonable violence" or in any way subjected him to "unusual indignity." *Dorwart,* 966 P.2d at 1151. Because Haun has not pointed to any evidence sufficient to raise a genuine issue of material fact as to the elements of his trespass claim, Defendants motion for summary judgment should be granted in this respect.

### 6.    Invasion of Privacy

Haun agrees that Chase's motion to summarily dismiss this claim is well-taken, but argues that Nash and Dentler are liable for the alleged invasion of his privacy because they were integral participants in Duryee's entry into his apartment.

Montana recognizes a common law cause of action for invasion of privacy for a "wrongful intrusion into one's private activities in such a manner as to

[cause] outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Deserly v. Department of Corrections*, 995 P.2d 972, 977 (Mont. 2000) (citation and quotation omitted).

Nash and Dentler maintain there is no evidence indicating their conduct caused outrage or mental suffering, shame or humiliation to a person of ordinary sensibilities. Defendants' burden, of course, is to "show" the district court that there is an absence of essential evidence to support the opposing party's claim. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 325 (1986). The Ninth Circuit has recognized that the *Celotex* "showing" may be made by argument alone. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

Haun presents virtually no argument in response. He simply states that "the issue of whether Nash and Dentler's conduct "was wrongful or caused damages is a jury question." Dkt. 51 at 7. But because Haun does not point to any evidentiary materials in support of the elements of a claim for invasion of privacy, the fails as a matter of law and Nash and Dentler are entitled to summary judgment.

## III.  <u>Conclusion</u>

Based on the foregoing,

IT IS RECOMMENDED that Chase, Nash, and Dentler's Motions for

Summary Judgment on Plaintiff's Individual and Official Capacity Claims be

GRANTED.[8]

DATED this 28th day of September, 2012.

_____
Jeremiah C. Lynch
United States Magistrate Judge

---

[8]The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel on or before October 8, 2012, and any response by the opposing party must be filed on or before October 15, 2012. *See United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978) (the court need not give the parties the full ten day period set forth in 28 U.S.C. § 636(b)(1) within which to file objections).